UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


Shari Machesney,

      Plaintiff,

v.                                  Case No. 10-10085

Lar-Bev of Howell, Inc., *et al.*,         Honorable Sean F. Cox

      Defendants.

_____/


## OPINION & ORDER DENYING
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

On March 14, 2013, this Court heard oral argument with respect to pending Motions for

Class Certification in three separate actions that assert claims under the Telephone Consumer

Protection Act, including this action.  In addition, the parties have extensively briefed the

motions.  For the reasons that follow, the Court shall DENY Plaintiff's Motion for Class

Certification in this action.

## BACKGROUND

**A.      General Factual Background**

A recent published opinion issued by the United States Court of Appeals for the Seventh

Circuit sets forth the rather extensive factual backdrop to these actions.  *Reliable Money Order,*

*Inc. v. McKnight Sales Co.*, 704 F.3d 489 (7th Cir. Jan. 9, 2013).

"Anderson + Wanca and Bock & Hatch are two Chicago area law firms that specialize in

representing plaintiffs in class action lawsuits under the Telephone Consumer Protection Act as

amended by the Junk Fax Prevention Act of 2005" (the "TCPA"). *Id.* at 491. The TCPA authorizes $500.00 in statutory damages for faxing an unsolicited advertisement, and each transmission is a separate violation. And the award triples upon a showing of willfulness. *Id.* (citing 47 U.S.C. § 227(b)(1)(C) and (b)(3)). "Because plaintiffs may enforce the statute via class action and because a single advertisement is often faxed to hundreds – if not thousands – of phone numbers, suits under the Act present lucrative opportunities for plaintiffs' firms." *Id.*

A woman named Caroline Abraham functioned as a modern-day "typhoid mary" in the small business communities in which she operated. As the Seventh Circuit explained, "Abraham and her company, Business-to-Business Solutions ('B2B') sit at the center of this lawsuit and scores of others":

> B2B contracted with businesses to send advertisements via facsimile. Advertisers would pay a fee, and B2B would send the ad to hundreds of fax numbers purchased from InfoUSA, Inc. (a practice known as "fax-blasting"). Abraham, B2B's sole employee, never obtained from the fax recipients permission to send them the advertisements.

*Id.*

Unfortunately for the businesses that Abraham offered her services to, "[t]he TCPA is essentially a strict liability statute" which imposes liability upon senders of unsolicited faxes. *Alea v. London Ltd. v. American Home Sys., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011). That is, the statute does not require any intent on the part of the sender for liability, except when awarding treble damages. *Id.* And the relevant FCC regulations define a "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(a)(10). In addition the FCC has concluded that "the entity or entities on whose behalf

2

facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12391, 12407 (1995). Thus, a defendant "cannot escape liability simply by hiring an independent contractor to transmit unsolicited facsimiles on their behalf." *Bridgeview Health Care Ctr., Ltd*., 2011 WL 4585028 (N.D. Ill. 2011).

In any event, Anderson + Wanca came across B2B and Abraham while they were investigating four putative class actions in Illinois. *Reliable Money Order, Inc.,* 704 F.3d at 491. They learned that the defendants in those four cases had contracted with B2B to fax the offending advertisements. "Unsurprisingly, Caroline Abraham's B2B records became the focus of discovery." *Id.* Abraham ultimately produced spreadsheets in discovery that listed only the recipients of the advertisements at issue in the four cases. As explained by the Seventh Circuit:

> Flush with success, Anderson + Wanca recognized that the B2B hard drives and fax lists likely contained a treasure trove of potential clients for putative class action lawsuits. So, despite having all information necessary to certify the classes in the Four Cases, Anderson + Wanca continued pushing Caroline Abraham to disclose all B2B fax transmission data. Ryan Kelly, an attorney at Anderson + Wanca, met with Caroline Abraham and asked her for the actual back-up disks and hard drive. He told her that "nobody would look at anything on these media not related" to the Four Cases. Indeed, Kelly even emailed Ms. Abraham a copy of the protective order filed in one of the Four Cases, explaining that it "will prevent [Kelly] from disclosing any of the back-up disks or hard drive to any third-party." To receive those protections, however, the producing party had to stamp documents confidential or notify plaintiff's counsel of their confidential nature at the time of production. Ms. Abraham continued to resist.
>
> Ultimately, plaintiff's counsel subpoenaed Joel Abraham to testify at a deposition. The subpoena also ordered Mr. Abraham to produce, at the time of his deposition, the back-up disks and hard drive. Appearing at the deposition with attorney Eric Ruben, Joel Abraham produced the materials. Neither he nor Ruben, who had read the protective order, asserted confidentiality. Even so, Anderson + Wanca later instructed defense counsel to "treat the DVD produced by Joel Abraham as confidential pursuant to the protective order[.]" *CE Design*

3

*Ltd. v. Cy's Crabhouse North, Inc,* No. 07 C 5456, 2010 WL 2365162, at *6
(N.D. Ill. June 11, 2010) [hereinafter *Cy's Crabhouse I*].

> The back-up disks and hard drive revealed not only the recipients of fax advertisements sent by the defendants in the Four Cases but the names of other B2B clients as well.

*Id.* at 492.

Then, "armed with data from B2B's electronic files," Plaintiff's counsel "filed scores of putative class actions" under the TCPA. *Id.* "The B2B files provided a treasure trove of potential new clients for Anderson + Wanca, revealing the names of other potential defendants who contracted with B2B to send unsolicited fax advertising and listing the recipients of that advertising." *Id.* at 492. "Hoping to tap that reserve of potential litigants, Anderson + Wanca began sending out solicitation letters to the recipients of B2B's fax-blasting." *Id.* The letter at issue in *Reliable Money Order, Inc*., read, in part:

> My law firm pursues class action lawsuits against companies that send junk faxes in Illinois and elsewhere.
> . . . .
>
> During our investigation, we have determined that you are likely to be a class member in one or more cases we are pursuing. You might not remember receiving the junk faxes, but if the lawsuit were successful, you would receive compensation (from $500 to $1,500) for each junk fax sent to you.
>
> We would like to discuss this issue with you. Please call me at [phone number] or send an email to [email address].

*Id*. at 492-93. The Seventh Circuit noted:

> The letter was stamped "advertising material" at the bottom but was not registered with the Wisconsin Office of Lawyer Regulation, as required by state law. See Wis. Sup. Ct. R. 20:7.3(c). Plaintiff's counsel subsequently destroyed their records identifying the recipients of these letters, explaining to the magistrate judge in *Ashford Gear* that they did "not possess and did not retain a list of the names and addresses of the persons who were sent" these letters.
> Upon receipt of this letter, *Fast & Friendly Grocery forwarded it to*

4

> *Reliable Money Order, who contacted Anderson + Wanca and became the named plaintiff in this case.  Reliable Money Order rents space from Fast & Friendly and possessed the only fax machine on the property.*  Reliable Money Order was not the only new client netted from the solicitation letters: Anderson + Wanca attorneys have filed *over one hundred* putative class actions under the Act, all rooted in data recovered from the B2B disks and hard drive.

*Id.* at 493 (emphasis added).

The Seventh Circuit also noted some questionable conduct on the part of Anderson +

Wanca in sending a $5,000 check:

> In August 2009, Anthony Wanca, a partner with Anderson + Wanca, sent Ruben a $5,000 check, made payable to Eric Ruben, in a Ramada Inn envelope.  The envelope contained no cover letter but the check beared a notation simply reading "document retrieval." Ruben voided the check and returned it.  Plaintiff's counsel has previously compensated Ms. Abraham for expenses arising from the depositions and document production but these earlier payments never neared $5,000.

*Id.* at 493.

Upon learning of Anderson + Wanca's actions as described above, defendants in some of

the lawsuits arising from the B2B data "began challenging the propriety of class certification on

grounds that misconduct by Anderson + Wanca disqualified the firm as adequate class counsel."

*Id*. at 493.  Those defendants have "generally raised three instances of misconduct": 1) that

Anderson + Wanca "breached a promise of confidentiality by using B2B data to identify targets

of additional lawsuits"; 2) that the firm "sent misleading solicitation letters"; and 3) "they

challenge the $5,000 check as improper witness compensation intended to influence the content

of testimony."  *Id*.

The district court in *Reliable Money Order, Inc*., after applying the standard set forth in

*Ashford Gear II* to the class certification question, ultimately certified the proposed class and

appointed Anderson + Wanca as class counsel.   In doing so, it reasoned that ethical violations alone do not render class counsel inadequate.  *Id*. at 496.  The Seventh Circuit noted that federal district courts have applied the *Ashford Gear II* "serious doubt" standard to the very same misconduct.  *Id*.  "Although the various district courts made conflicting findings on whether Anderson + Wanca breached a promise of confidentiality or mailing misleading solicitations" they "all agreed that the conduct did not require denial of class certification."  *Id.* at 496-97.

The defendant in *Reliable Money Order, Inc*., appealed.  The Seventh Circuit began its opinion by stating that the conduct engaged in by Anderson + Wanca "gives this Court serious pause."  *Id*. at 490-91.

The court explained that  "while we neither approve of nor condone the actions of Anderson + Wanca attorneys when investigating the claims in this suit, we nevertheless do not conclude that counsels' questionable performance in the investigative stage of this case prevents class certification."  *Id*. at 491.  It ultimately concluded that Anderson + Wanca's misconduct does not require denial of class certification.  In reaching that conclusion, it concluded that "unethical conduct, not necessarily prejudicial to the class, nevertheless raises a 'serious doubt' about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case."  *Id*. at 499.  But the court further stated: "Our holding here reflects only the judgment that actions such as occurred here – which do not prejudice an attorney's client or undermine the integrity of judicial proceedings – do not mandate disqualification of counsel."  *Id*. at 500.

The conclusion of the Opinion states:

> In closing, *we emphasize our concern over the challenged actions that*

6

> *Anderson + Wanca attorneys have taken while investigating this case and others.*
> [Defendant] McKnight warns that our outcome will incentivize and reward overly
> aggressive and unethical attorney conduct.  But this scenario of unpunished,
> inappropriate attorney action results only if the litigants and fellow members of
> the bar fail to refer legitimate instances of attorney misconduct to the relevant bar
> authority for investigation.  But when an ethical breach neither prejudices an
> attorney's client nor undermines the integrity of the judicial proceedings, state bar
> authorities are generally better positioned to address the matter through
> disciplinary proceedings, rather than the courts through substantive sanction in the
> underlying lawsuit.  Notwithstanding, when appropriate, a federal courts retains
> the power to impose discipline or refer questionable conduct for further
> investigation.  Therefore, we . . . AFFIRM the district court's certification of the
> class.

*Id.* at 502 (emphasis added).

## B.    The Three TCPA Cases Pending Before This Court

There are three TCPA cases currently pending before this Court wherein Plaintiffs are

represented by the same counsel and assert nearly identical claims: 1) *Machesney v. Lar-Bev of*

*Howell, Inc., et al.* (Case No. 10-10085) ("*Machesney*"); 2) *APB Associates, Inc. v. Bronco's*

*Saloon, Inc., et al.* (Case No. 09-14959) ("*APB Associates*"); and 3) *Compressors Engineering*

*Corp. v. Manufacturers Financial Corp. et al.* (Case No. 09-14444) ("*Compressors*

*Engineering*").

This Court initially dismissed each of these three cases for lack of subject matter

jurisdiction, based upon then-existing case law from the Sixth Circuit.[1]  All three of these cases

incurred a delay due to the resolution of the issue of whether federal-question jurisdiction exists

over TCPA cases, ultimately ruled upon by the United States Supreme Court, which ruled that

---

[1]*Dun-Rite Constr., Inc. v. Amazing Tickets, Inc.*, 2004 WL 3239533 (6th Cir. 2004).

federal-question jurisdiction does exist.[2]  These three cases then resumed after the mandate in each was issued.

### 1.     *Machesney*

There is one named Plaintiff in this action, Shari Machesney, an individual.  (D.E. No. 1). There are five named Defendants,[3] which are corporate entities: 1) Lar-Bev of Howell, Inc.; 2) Larbev, Inc.; 3) LarBev-Fenton, Inc., 4) Larbev-Union Lake, Inc.; and 5) Larbev-Waterford, Inc.

The Complaint alleges that on or about "February 14, 2006, Defendants sent by telephone facsimile machine an unsolicited advertisement to Plaintiff's facsimile machine.  A copy of the facsimile is attached hereto and marked as Exhibit A."  (*Id*. at 3).  Plaintiff alleges that Defendants did not have Plaintiff's prior express invitation or permission to send advertisements to Plaintiff's fax machine and that, upon information and belief, "Defendants have sent similar unsolicited facsimile advertisements to at least 39 other recipients."  (*Id*.).

Among their Affirmative Defenses, Defendants assert that "[i]t is a total defense if the facts demonstrate that the Defendants had a business relationship with the Plaintiffs."  (D.E. No. 14 at 3).

Under the Initial Scheduling Order in this action, the parties agreed that class and merits discovery would generally be combined and that fact discovery would be completed by July 2, 2012.  (D.E. No.  33).

Plaintiff filed her Motion for Class Certification on September 24, 2012.  (D.E. No. 48).

_____

[2]*See Charvet v. EchoStar Satellite, LLC*, 630 F.3d 459, 463 (6th Cir. 2010) and *Mims v. Arrow Fin. Srvs., LLC*, 132 S.Ct. 740 (2012).

[3]Plaintiff's complaint named ten unidentified "John Doe" Defendants, but Plaintiff later agreed those unidentified Defendants should be dismissed.  (*See* 3/14/13 Hrg. Tr.).

That motion states that Defendants either owned or oversaw Kentucky Fried Chicken ("KFC")

franchises.  Plaintiff claims that Defendants hired Caroline Abraham (aka Business to Business

Solutions) to send faxes out on their behalf.  Plaintiff's Motion for Class Certification states that

Defendants' advertisements are form documents that were sent to 9,497 unique fax numbers.[4]

(D.E. No. 48 at 13).  Plaintiff asks the Court to certify the following class:

> All persons who were sent one or more faxes on November 28, 2005, November
> 30, 2005, February 14, 2006, or February 15, 2006, offering "KFC Catering
> Prices," including "200 HOT WINGS" for $79.99 and a variety of "KFC's
> FAMOUS SIDE DISHES," and identifying and [sic] a "Complaint Hotline"
> number of (718) 645-2021 Ext. 232 or (718) 360-1330 ext. 232.

(D.E. No. 48).

During discovery, Ms. Machesney testified that she gave a "pile of faxes" to her co-

worker, over a number of years, who was also her landlord.  (Machesney Dep. at 6).  She testified

that she had complained to her landlord "about all of these faxes, and she informed me that we

could possibly do something with her grandson with getting them stopped."  (*Id*.).  Her grandson

is Phil Bock, an attorney with Bock & Hatch.  (*Id*.).

She testified that she does not know when she received the fax at issue in this action, she

does not have it, and she no longer has the fax machine.

In any event, Machesney testified that she became a plaintiff in this lawsuit after she was

contacted by the law firm.  (*Id*. at 9-10).  Machesney signed a written retainer agreement with her

counsel (*Id*. at 27).  In that written agreement, she agreed, among other things, that:

---

[4]And Plaintiff's Reply Brief asserts that there were 15,397 separate TCPA violations by
these Defendants.  If awarded the minium statutory damages of $500.00 per violation, that would
amount to $7,698,500.00 in damages if the violations were not willful, assuming just one person
or entity has standing to sue over a given fax.  If Defendants willfully or knowingly violated the
statute, the minimum statutory damages could be trebled to more than $23,000,000.00.

> Client understands and agrees that Attorneys will seek an attorneys' fee award equal to one-third of any benefit conferred upon the class, and Client expressly agrees not to oppose Attorneys's request.

(Ex. A submitted at Class Cert. Hrg., attached to this Opinion & Order as Ex. A, filed under seal[5]).

Defendants contend that the Motion for Class Certification should be denied on multiple grounds, including: 1) Machesney is not an adequate class representative because she has no independent knowledge of the facts in her complaint and she is merely relying on information provided by her attorney; 2) Counsel is not adequate to represent the class due to their lack of integrity and ethical violations including, "ambulance chasing" and stirring up litigation; 3) Class Counsel also is also not adequate due to their conduct regarding spoiliation of evidence (i.e., they do not have the fax that was sent to Machesney or the fax machine);

4) denial of certification will not prejudice the rights of the class, who can file actions of their own if they wish, it will just impact Plaintiff's Counsel; 5) the class mechanism is not superior here, where each person harmed can file their own action; 6) the class should not be certified because of individualized issues; 7) the proposed class definition is unworkable because it is not consistent with Plaintiff's alleged burden of having to show that the faxes were unsolicited and received; and 8) proof of receipt is required to show that any potential class member has standing.

### 2. *APB Associates*

There is one named Plaintiff in this action, APB Associates, Inc., a corporate entity. (D.E. No. 1). There are five Defendants: 1) Bronco's Saloon, Inc.; 2) Bronco's Entertainment,

---

[5]Plaintiff's Counsel contends that the retainer agreement is privileged.

Ltd.), 3) T&R Enterprises, Inc.; 4) River Entertainment, LLC; and 5) 31650 West Eight Mile, Inc.

The Complaint alleges that on or about "February 27 2006, Defendants sent by telephone facsimile machine an unsolicited advertisement to Plaintiff's facsimile machine. A copy of the facsimile is attached hereto and marked as Exhibit A." (*Id*. at 3). The fax ad at issue advertised four different businesses: 1) the Pony Express Saloon, located at 31650 W. Eight Mile Road; 2) the Mustang Inn; 3) Chix on Dix; and 4) the Bronco Saloon. (*Id*.). Plaintiff's December 22, 2009, Complaint alleges that Defendants "are Michigan corporations that operate bar restaurants under the names Bronco Saloon, Pony Express Saloon, and Mustang Inn." (Compl. at ¶ 9). Plaintiff alleges that Defendants did not have Plaintiff's prior express invitation or permission to send advertisements to Plaintiff's fax machine and that, upon information and belief, "Defendants have sent similar unsolicited facsimile advertisements to at least 39 other recipients." (*Id*.).

Among their Affirmative Defenses, Defendants assert that "the alleged class members consented to the receipt of any alleged facsimile transmissions." (*See, e.g.*, D.E. No. 10 at 9 in *APB Associates*).

On January 20, 2010 – *while this action asserting claims against the owner of the Pony Express Saloon was pending* – Anderson + Wanca sent the Pony Express Saloon a solicitation letter:

> My law firm pursues class action lawsuits against companies that send junk faxes in Illinois and elsewhere. Federal law prohibits advertising faxes sent without first obtaining the recipient's prior express permission or invitation. Through litigation, we enforce this federal law to seek compensation for the recipients of junk faxes and to stop future junk faxes.
> During our investigation, we have determined that you are likely to be a class member in one or more of the cases we are pursuing. You might not

11

remember receiving the junk faxes, but if the lawsuit were successful, you would receive compensation (from $500 up to $1,500) for each junk fax sent to you.
> We would like to discuss this issue with you.  Please call me at [phone number].  Please call me at [phone number] or send an email to [email address].

(Ex. I to Defs.' Br.)

Under the Initial Scheduling Order in this action, the parties agreed that class and merits discovery would generally be combined.  (*See, e.g.*, D.E. No. 24).

During discovery, Patricia Becker, the owner and corporate designee of the named Plaintiff, testified that she does not recall how she first made contact with Plaintiff's Counsel. (Patricia Becker Dep. at 12&14-15).  Like *Machesney*, Becker signed a written retainer agreement with counsel wherein she agreed, on behalf of APB Associates, that "Client understands and agrees that Attorneys will seek an attorneys' fee award equal to one-third of any benefit conferred upon the class, and Client expressly agrees not to oppose Attorneys's request." (Ex. B submitted at Class Cert. Hrg., attached to this Opinion & Order as Ex. A, filed under seal).

Plaintiff filed its Motion for Class Certification on April 16, 2012.  (Docket Entry No. 34).  Plaintiff asks the Court to certify the following class:

> All persons who were sent faxes on February 27, 2006, that listed "Bronco Saloon," "Pony Express Saloon," "Mustang Inn," "Chix on Dix," and a "Complaint Hotline" number of (718) 360-1330, ext 232.

(*Id*. at 1).

That motion states that Defendants are three Michigan taverns and one gentlemen's club that are all owned by the same person – Richard Skinner.  (*Id*. at 3).  Plaintiff claims that Defendants hired Caroline Abraham (aka Business to Business Solutions) to send faxes out on

their behalf. Plaintiff asserts that the "Defendants' advertisement is a form document that was sent to 4,088[6] unique fax numbers." (*Id.* at 10).

Defendants contend that the Motion for Class Certification should be denied on multiple grounds: 1) ABP Associates is not an adequate class representative because it has no personal knowledge of having received the fax and it lost or destroyed the fax; 2) class counsel is inadequate because of its questionable ethical conduct and misleading and improper solicitation letters – including one sent to Pony Express while this case was pending; 3) proposed Class Counsel's only interests are their own; 4) individualized issues make this case inappropriate for class treatment, such as whether there was an established business relationship or consent; 5) it would be impossible to ascertain who is in the class; 6) proceeding as a class action is not superior to allowing individual actions because individuals can obtain $500-$1500 on their own and, on the other hand, "[r]epresentative litigation in the TCPA context only results in diminishing claims to the individual in having to pay for class counsel's attorney's fee."

As to ascertaining who would be in the class or have standing to assert a claim against them, Defendants' Joint motion argues:

> Such a showing also requires establishing oneself as the owner of the particular facsimile number to which any unsolicited fax advertisement was sent, as of February 27, 2006, when the fax was allegedly transmitted. Plaintiff's plan on that issue seems to be to just forward notice of the lawsuit to the fax numbers where the fax broadcasts was purportedly sent and then ask that defendants pay whoever might respond. But that is far too simplistic an approach in that it completely fails to provide any assurances that whoever might receive the notice and respond with a request for payment is, in fact, the proper party of interest,

---

[6]If awarded the minium statutory damages of $500.00 per violation, that would amount to $2,044,000.00 in damages if the violations were not willful, assuming just one person or entity has standing to sue over a given fax. If Defendants willfully or knowingly violated the statute, the minimum statutory damages could be trebled to more than $6,132,000.00.

with standing to bring any claim for the February 27, 2006 fax transmission.  It does not account for changes in ownership, shared services (i.e. where to or more companies share space and office services) or other possibilities.  Taken to its extreme, under Plaintiff's approach, it is possible that Defendants could be made to pay on 4,000 plus claims, only to still have 4,000 TCPA claims remain.  While unlikely, given the time that has passed since the broadcast (more than six years), as well as the dated information that was used in the first place for the broadcast, ie. fax numbers acquired by InfoUSA sometime before 2004, this does present a significant issue in this case.  Indeed, Defendant's own brief research into business records of about 500 of the purported 4,000 plus transmissions reveals numerous instances of dissolved companies, nonlistings of putative class members and other potential problems.  See Ex T, Affidavit of paralegal Shari Boulier dated 12/3/12.  Accordingly, if a violation is found, to determine who might be the appropriate party with standing to sue for a particular claim requires still more individualized inquiry.  *See Saf-T-Gard Int'l, Inc.*, 251 F.R.D. at 315-16 ("this court finds that in the absence of some realistic means of identifying potential class members, class certification is inappropriate.  Plaintiff's suggestion of advertising in local newspapers to identify the recipients of a junk fax sent over a year also simply comes up short.").

(Defs.' Br. at 17-18).

Defendant T&R Enterprises, Inc., filed its own response brief opposing the motion.  It raises the same issues that the other Defendants in this action raise.

### 3.   *Compressors Engineering*

There is one named Plaintiff in this action, Compressor Engineering Corporation, Inc., a corporate entity.  (D.E. No. 1).  There are three Defendants: 1) Manufacturers Financial Corporation, 2) Charity Marketing, LLC; and 3) Richard K. Stephens.

The Complaint alleges that on or about November 30, 2005, "Defendants sent by telephone facsimile machine an unsolicited advertisement to Plaintiff's facsimile machine.  A copy of the facsimile is attached hereto and marked as Exhibit A."  (*Id*. at 3).  The fax ad at issue advertised "Great Residential and Commercial Lending" and instructed to call "(800) 264-3898, Ext 340" for details, but does not appear to the state the names of any businesses.

14

Plaintiff alleges that Defendants did not have Plaintiff's prior express invitation or permission to send advertisements to Plaintiff's fax machine and that, upon information and belief, "Defendants have sent similar unsolicited facsimile advertisements to at least 39 other recipients." (*Id*.).

Like the Scheduling Orders entered in the other two cases, the order in this case generally combined class certification and merits discovery. (D.E. No. 28).

Earl James Berwick, the corporate representative of Compressor Engineering Corp. Inc., testified that he did not seek out assistance from Plaintiff's Counsel. Rather, the corporation became involved in this action only after having received an unsolicited letter from Plaintiff's Counsel in Chicago. (Berwick Dep. at 34-36). The letter that Compressor Engineering Corp., Inc. received is attached to Defendants' Brief as Exhibit E.

Like Machesney and APB Associates's representative, Compressor Engineering's representative signed a written retainer agreement with Counsel agreeing to a one-third contingency fee.

Plaintiff filed its Motion for Class Certification on December 28, 2012. (D.E. No. 57). Plaintiff asks the Court to certify the following class:

> All persons who were sent one or more faxes on November 29, 2005, or November 30, 2005, that contained a "Remove" Hotline number of (718) 645-2018, Ext 2234 and a "Complaint" Hotline number of (718) 645-2021, Ext 232. and offered either a "Limited Release Refinance Program" with a toll free number of (800) 264-3898 or a "Fast Track Approval for Licensed Brokers! [sic] that included contact information for "Julia Kahn."

(*Id*. at 1).

That motion states that Defendant Richard K. Stephens was the sole owner of the two named corporate Defendants in this action, Manufacturers Financial Corporation, which offered

residential and commercial mortgages, and Charity Marketing, LLC, which was engaged in marketing.  Plaintiff claims that Defendants hired Caroline Abraham (aka B2B) to send faxes out on their behalf.  Plaintiff asserts that during a two-day period in November of 2005, "Defendants caused advertisements to be sent by fax to 14,137[7] persons in Michigan and Florida without first obtaining their express consent."  (*Id.* at 1-2).

Defendants contend that the Motion for Class Certification should be denied on multiple grounds, including: 1) Plaintiff's Counsel is not adequate to represent the class due to their unethical conduct; 2) the issue of whether there was an established business relationship between Defendants and any purported class member requires individualized inquiry; 3) the issue of whether the faxes were unsolicited (ie., transmitted without prior express invitation or permission) would require an individualized inquiry; 4) a class action is not superior to individual actions; and 5) the proposed class definition is defective in that it: does not require a fax to have been received, it does not limit the class to those who received unsolicited faxes, it does not exclude those with an established business relationship with Defendants, and it does not require the class members to have owned the fax machines that allegedly received the faxes at issue.

## ANALYSIS

### I.      Overview Of Class Certification Requirements

"Class certification is governed by Federal Rule of Civil Procedure 23."  *Wal-Mart*

---

[7]If awarded the minimum statutory damages of $500.00 per violation, that would amount to $7,068,500.00 in damages if the violations were not willful, assuming just one person or entity has standing to sue over a given fax.  If Defendants willfully or knowingly violated the statute, the minimum statutory damages could be trebled to more than $21,000,000.00.

*Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2548 (2011). A "trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*, 131 S.Ct. at 2551. The Sixth Circuit has explained that "[m]ere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled. Maintainability may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide . . . The parties should be afforded an opportunity to present evidence on the maintainability of the class action." *In re American Medical Sys., Inc.*, 75 F.3d at 1079 (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)).

The Supreme Court has recognized that sometimes it is necessary for the court to "probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if the trial court is satisfied, after a "*rigorous analysis*," that the prerequisites of Rule 23(a) have been satisfied. *Wal-Mart Stores, Inc.*, 131 S.Ct at 2552 (emphasis added). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* Going beyond the pleadings is necessary because a court must understand the claims, defenses, relevant facts, and applicable substantive law in

17

order to make a meaningful determination of the certification issues. *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011); *Reeb v. Ohio Dept. of Rehabilitation and Correction*, 435 F.3d 639, 644-45 (6th Cir. 2006).

The party seeking class certification bears the burden of establishing that all prerequisites for class certification are satisfied. *In re American Medical Sys., Inc*., 75 F.3d 1069, 1079 (6th Cir. 1996). "Given the huge amount of judicial resources expended by class actions, particular care in their issuance is required." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011).

"To obtain class certification, a claimant must satisfy two sets of requirements: (1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b). A failure on either front dooms the class." *Pilgrim*, 60 F.3d at 946.

### A.      Rule 23(a) Requirements

Under Rule 23(a), the party seeking certification must demonstrate, first, that:  1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and 4) the representative parties will fairly and adequately protect the interests of the class.

If the party seeking certification demonstrates that the requirements of Rule 23(a) are met, then the Court must consider whether one of the three requirements in Rule 23(b) has been met. Here, Plaintiffs assert that the requirements of Rule 23(b)(3) have been met.

18

### B.      Rule 23(b) Requirements

"Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Wal-Mart Stores, Inc.,*131 S.Ct at 2549 n.2.   Rule 23(b) further provides that  "matters pertinent to these findings" include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions;" "(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;" "(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and "(D) the likely difficulties in managing a class action."   Fed. R. Civ. P. 23(b)(3).

"Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the *more stringent requirement* that common issues 'predominate' over individual issues."  *In re American Medical Sys., Inc.*, 75 F.3d at 1084 (emphasis added).

## II.      Defendants' Arguments Opposing Adequacy Of Proposed Class Counsel, Based On Ethical Considerations, Do Not Warrant Denial Of Class Certification In These Actions.

In order to certify a class, the Court must find the named class representatives adequate. Fed. R. Civ. P. 23(a)(4).  In addition, if the Court certifies a class it must appoint class counsel. Fed. R. Civ. P. 23(g)(1).  It is therefore appropriate to look at whether the proposed class counsel, and the named Plaintiffs, are adequate.

### A.      Proposed Class Counsel

Pursuant to Rule 23, "[u]nless a statute provides otherwise, a court that certifies a class

must appoint class counsel." Fed. R. Civ. P. 23(g)(1).

Rule 23 further provides that, in appointing class counsel, the Court must consider: 1) "the work counsel has done in identifying or investigating potential claims in the action; 2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; 3) "counsel's knowledge of the applicable law"; and 4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Consideration of these factors is not an issue for the proposed counsel here, who are experienced in these cases and no doubt have the resources to proceed.

But Rule 23 also provides that the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Rule 23 further provides that where, as here, more than one applicant seeks appointment, "the court must appoint the applicant best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2).

Defendants contend that the Court should find Plaintiffs' Counsel inadequate due to their alleged ethical violations.

The parties have not directed the Court to any Sixth Circuit authority on this issue (ie., under what circumstances can a court decline to certify a class action based upon ethical violations by proposed counsel).

The Seventh Circuit has developed standards for determining when counsel should be deemed inadequate due to ethical concerns. *Reliable Money Order, Inc., supra*. There, the court ruled that "misconduct that prejudices the class or creates a direct conflict between counsel and the class requires" denial of class certification. *Id.* at *8. It further held that "unethical conduct,

20

not necessarily prejudicial to the class, nevertheless raises a 'serious doubt' about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.* at *9.

Under that standard, the Court finds that it would not be appropriate to deny certification in these cases – based solely upon ethical concerns with proposed class counsel. While Brian Wanca and his firm have engaged in conduct that is at least questionable from an ethical standpoint, there are three different attorneys and firms seeking to be named class counsel in these actions. And Rule 23 provides that when more than one applicant seeks appointment, "the court must appoint the applicant *best* able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2) (emphasis added). Thus, if this Court were to certify any of these actions, it could appoint Jason Thompson of Sommers Schwartz as class counsel, as it is undisputed that he played no role in the alleged unethical conduct.

### B.    Named Plaintiffs

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In order for representative parties to adequately represent a class, there must be no evidence of collusion or conflicting interests between the representative and the class." 59 Am. Jur. 2d *Parties* § 59.

It is well established that "the party seeking the class certification bears the burden of proof" and that Rule 23(a) contains four prerequisites, including adequacy of representation, "which must *all* be met before a class can be certified." *In re American Medical Sys., Inc.*, 75 F.3d at 1079 (emphasis in original).

Here, there are two potential problems with the named class representatives, although the

first one could be remedied by changing the class definitions.

First, the TCPA allows a "person or an entity" to bring a private action to recover damages. Here, all of the proposed class definitions are limited to "persons" who were sent faxes. Two of the named class representatives, however, are corporate entities (i.e., *ABP Associates*. and *Compressor Engineering*). Thus, as it stands, these two corporate entities are not actually members of the proposed classes as defined by Plaintiffs' Counsel. Obviously, however, that could be remedied by changing the class definition to "persons or entities" who received faxes.

The second potential issue deals with whether or not these parties will fairly and adequately represent the class. The named Plaintiffs in these cases signed written retainer agreements with Plaintiffs' Counsel, stating that they understand and agree that Counsel will seek an attorney fee award equal to one-third of any recovery by the class and that they *expressly agree not to oppose that request*. Thus, these proposed named Plaintiffs, who claim that they will fairly and adequately protect the interests of the class, have agreed, in advance, not to contest a one-third contingency fee request by counsel – regardless of the amount of work actually performed by Counsel in these cases. That is troubling to this Court, in light of the repetitive[8] nature of these actions and considering the amount of work actually performed by Counsel in relation to the settlements and/or judgments that have been obtained in other cases.

---

[8]Because cases like those pending before the undersigned are so similar, and Counsel have litigated so many of them, Counsel is able to recycle the same pleadings, discovery, research, motions, etc. in these cases.

22

**III.   This Court Shall Deny Plaintiff's Motions For Class Certification For Several Reasons.**

For the reasons detailed below, this Court shall deny Plaintiff's Motion for Class Certification.

**A.      Lack Of An Ascertainable Class**

One major impediment to class certification in this case, as it is in the other two cases pending before this Court, is ascertainability of the proposed class.  As this Court noted in *In re OnStar Contract Litig.*, 278 F.R.D. 352, 373 (E.D. Mich. 2011):

> "The existence of an ascertainable class of persons to be represented by the proposed class representative[s] is an implied prerequisite of Federal Rule of Civ Procedure 23.*"  John v. National Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (cited with approval in *Romberio v. Unumprovident Corp*., 385 Fed.Appx. 423, 431 (6th Cir. 2009)).  As such, a class definition should be based on objective criteria so that class members may be identified without individualized fact finding.  *Id.; Crosby v. Social Sec. Admin*., 796 F.2d 576, 580 (1st Cir. 1986); *see also* 7A Wright & Miller, Federal Practice and Procedure, § 1760 (3d ed.) (The class description must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.")

*Id.* at 373.  Thus, "[b]efore a court may certify a class pursuant to Rule 23," the class definition must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class."  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (internal citations omitted).  That means that the class definition must be "precise" and "there can be no class action if the proposed class is 'amorphous' or 'imprecise.'" *Id.*

Here, Plaintiffs seek class certification of the following proposed classes in these three cases:

*Machesney*:                        "*All persons who were sent* one or more faxes on November 28,

23

2005, November 30, 2005, February 14, 2006, or February 15, 2006, offering "KFC Catering Prices," including "200 HOT WINGS" for $79.99 and a variety of "KFC's FAMOUS SIDE DISHES," and identifying and [sic] a "Complaint Hotline" number of (718) 645-2021 Ext. 232 or (718) 360-1330 ext. 232." (emphasis added).

*APB Associates*:  "*All persons who were sent* faxes on February 27, 2006, that listed "Bronco Saloon," "Pony Express Saloon," "Mustang Inn," "Chix on Dix," and a "Complaint Hotline" number of (718) 360-1330, ext 232."  (emphasis added).

*Compressors Engineering*:  "*All persons who were sent* one or more faxes on November 29, 2005, or November 30, 2005, that contained a 'Remove' Hotline number of (718) 645-2018, Ext 2234 and a 'Complaint' Hotline number of (718) 645-2021, Ext 232. and offered either a "Limited Release Refinance Program" with a toll free number of (800) 264-3898 or a "Fast Track Approval for Licensed Brokers! [sic] that included contact information for "Julia Kahn." (emphasis added).

(D.E. No. 48 at 1 in *Machesney*; D.E. No. 34 at 1 in *APB Associates*; D.E. No. 57 at 1 in

*Compressors Engineering*).

Again, in order to have an ascertainable class, you need to be able to determine who is in

the class.  At first blush, it might seem obvious what it means to be a person "who was sent" a

specific fax on a given date.  But after examining the Defendants' various arguments, including

their arguments on standing, this Court concludes that is not the case.

**1.      The Proposed Imprecise And Amorphous Class Definitions Include Persons That Appear To Lack Statutory Standing To Assert A TCPA Claim Based Upon An Unsolicited Fax Advertisement**

The named Plaintiffs in each of these three actions have filed putative class actions

against Defendants for violations of the TCPA.

Defendants have challenged the standing of proposed class members to assert claims and

have challenged the proposed class definitions as fundamentally flawed because they do not

24

include a requirement that the class members owned the fax machines that received the fax advertisements at issue.

"Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded this injured plaintiff the right to sue the defendants to redress his injury." *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (6th Cir. 2007). To answer that question, the Court first examines the text of the statute and then, if ambiguous, analyzes other indicia of congressional intent such as legislative history. *Id.*

The TCPA makes it unlawful to "use any telephone facsimile machine, computer, or other device to send, *to a telephone facsimile machine*, an unsolicited advertisement" unless certain exceptions apply. 47 U.S.C. § 227 (b)(1) (emphasis added). Under the TCPA, the "term 'telephone facsimile machine' means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." 47 U.S.C. § 227 (a)(3).

The TCPA provides a private right of action to enforce its provisions. It provides that a "person or entity may" bring "an action based on a violation" of the statute to: 1) "enjoin such violation"; 2) "to recover for actual monetary loss from such a violation, or to received $500 in damages for each such violation, whichever is greater"; or 3) "both such actions." 47 U.S.C. § 227(b)(3). In addition, "[i]f the court finds that the defendant willfully or knowingly violated" the statute, "the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount" of the plaintiff's award for statutory or actual damages. *Id*.

The TCPA itself does not specify who may sue for damages after an unauthorized fax

advertisement has been unlawfully sent to a telephone facsimile machine. It is therefore appropriate to look to legislative history.

In enacting the TCPA, Congress noted "the proliferation of facsimile machines" in the business community had been "accompanied by explosive growth in unsolicited facsimile advertising, or 'junk fax.'" H.R. Rep. 102-317 at 10 (1991). Congress further stated that such advertising "is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." *Id.* That is, "in the case of fax advertisements, "the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out the facsimile messages" and in addition to the paper and ink costs, "when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications. *Id*. at 25.

Thus, the legislative history indicates that the injury that the TCPA was intended to address is the cost of the paper and ink incurred by the owner of the fax machine and the fax machine owner's loss of the use of the machine.

And here, each of the named Plaintiffs in these three cases appears to allege that it owned the fax machine to which the fax advertisements at issue were sent:

"On or about February 14, 2006, Defendants sent by telephone facsimile machine an unsolicited advertisement *to Plaintiff's facsimile machine*." (*Machesney* Compl. at ¶ 10) (emphasis added).

"On or about February 27, 2006, Defendants sent by telephone facsimile machine an unsolicited advertisement *to Plaintiff's facsimile machine*." (*APB Associates*

Compl. at ¶ 10) (emphasis added).

> "On or about November 30, 2005, Defendants sent by telephone facsimile machine an unsolicited advertisement *to Plaintiff's facsimile machine*." (*Compressors Engineering* Compl. at ¶ 10) (emphasis added).

And each of the complaints in these actions allege as follows with regard to the damages incurred due to unsolicited fax advertisements:

> Unsolicited faxes damage their recipients.  A junk fax recipient loses the use of its fax machine, paper, and ink toner.  An unsolicited fax also causes the recipient to waste valuable time it would have spent on something else.  Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipient fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

(*Machesney* Compl. at ¶ 3; *APB Associates* Compl. at ¶ 3; *Compressors Engineering* Compl. at ¶ 3).  Then, each of the Complaints allege that the named Plaintiffs, and other class members, were damaged in the following respects:

> Defendants' actions caused damages to Plaintiff and the other class members. Receiving Defendants' junk faxes caused the recipients to lose paper and toner consumed in printing of Defendants' faxes.  Moreover, Defendants' faxes used Plaintiff's fax machine.  Defendants' faxes cost Plaintiff time, as Plaintiff and its employees wasted their time receiving, reviewing and routing Defendants' illegal faxes.  That time otherwise would have been spent on Plaintiff's business activities.  Finally, Defendants' faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone.

(*Machesney* Compl. at ¶ 26; *APB Associates* Compl. at ¶ 26; *Compressors Engineering* Compl. at ¶ 26).

Although there have been many TCPA cases in federal court, including many cases that have been certified as class actions, there is a surprising lack of case law as to who has statutory standing to pursue a TCPA based upon the receipt of an unsolicited fax advertisement.  And, as Plaintiff's Counsel acknowledged at the March 14, 2013, hearing, there is no such authority from

the Sixth Circuit.

One case that addresses the issue, but not in any detail, is *Kennard v. Electronic Data Sys., Inc*., 1998 WL 34336245 (Tex. Dist. 1998), wherein the Court found the following:

> 4. The type of damages that class members suffered as a result of receiving the [fax advertisement at issue] are the cost of paper, toner, and other expenses related to processing the fax itself, as well as the amount of time spent in reviewing it and/or the amount of time spent in disposing of it.
>
> 5. The party who was the recipient of the unsolicited fax advertisement incurs these expenses and is the injured party.
>
> 6. It is the person who owned or operated the fax machine which received the unsolicited fax advertisement who has standing to bring a claim under the TCPA.

*Id*. at *1.

Based upon the language of the statute, making it unlawful to send an unsolicited fax advertisement "to a telephone facsimile machine", and the legislative history that shows that the injury that the TCPA was intended to address is the cost of the paper and ink incurred by the owner of the fax machine and the fax machine owner's loss of the use of the machine, this Court concludes that the person or entity that owned the fax machine that received the unsolicited fax advertisement at issue is the person or entity with standing to assert a TCPA claim.

In fact, it appears that Plaintiff's Counsel (Anderson + Wanca and Bock & Hatch) have previously taken the position that the persons or entities who *owned the fax machines* are the appropriate class members in a TCPA action. *See, e.g., Holtzman v. Turza*, 2009 WL 3334909 (N.D. Ill. 2009). In that case, the named plaintiff sought class certification and plaintiff's proposed class definition included all persons who "owned or paid for some portion of the machine to which the fax was sent." *Id*. at *1. The defendants objected to the proposed class

28

definition, asserting that such language "could prompt multiple claims stemming from a singular

fax transmission" and the district court, glossing over the standing issue, agreed and certified a

class of persons who "were sent" certain fax advertisements.  In this Court's view, however, such

a ruling accomplished nothing in the way of preventing multiple claims stemming from a single

fax because the court did not explain what is meant by a person who "was sent" a fax

advertisement (i.e., does that include the person who owned the fax machine, the person to whom

the fax advertisement was addressed, the person who happened to pick up the fax ad from the

machine[9], the person who opened the account and paid the bill for the telephone line that the fax

machine used to receive signals, or all of the above?).

Plaintiffs also direct the Court to another decision that cited *Holtzman, G.M. Sign, Inc. v.*

*Group Comms., Inc*., 2010 WL 744262 (N.D. Ill. 2010).  In that case, the defendant argued that

the class definition of persons who "were sent" certain fax advertisements was insufficient

because it contains no requirement that "the class members actually owned the fax machines to

which the advertisements were sent."  *Id.* at *3.  In rejecting that argument, the district court also

glossed over the standing issue, stating only:

> As to [defendant's] argument that the definition should include language
> regarding ownership of the receiving machines, such language is not required by
> the statute and actually has the potential to invite multiple claims for each fax. *See*
> *Holtzman v. Turza*, No 08 C 2014, 2009 WL 3334909, at *6 (N.D. Ill. Oct. 14,
> 2009).

*Id.*  Like the district court in *Holtzman*, the district court in that case certified a class of persons

---

[9]*See Kopff v. World Research Group, LLC,* 568 F.Supp.2d 39, 42 (Dist. Columbia 2008)
(wherein the court concluded that while the plaintiff did not have standing after merely picking
up the fax advertisement at issue, which was specifically addressed to her husband, the court
expressed that it "might think otherwise" were the fax addressed "generically – e.g., to
'Employee of Heritage Management' – or were they not addressed at all."  *Id*. at 42.

who "were sent" certain fax advertisements.  But again, such a ruling accomplishes nothing in terms of preventing multiple claims stemming from a single fax because it leaves it unclear as to what is meant by a person who "was sent" a fax advertisement (i.e., does that include the person who owned the fax machine, the person who opened the account and paid the bill for the telephone line that the fax machine used to received signals, a person to whom the fax advertisement was addressed, persons who happened to pick up the fax, or all of the above?).

The Supreme Court of Kansas issued a decision in a TCPA case that addressed this kind of ambiguity in defining a class in a TCPA unsolicited fax case.  *Critchfield Phys. Therapy v. Taranto Group, Inc.*, 293 Kan. 285 (2011).  That case, like the cases here, involved a business using a fax blasting contractor to send a large amount of fax advertisements.  The trial court certified the following class: "The end users of the fax numbers to which Defendant sent or caused to be sent, one or more facsimile transmissions advertising Defendants's products or seminars during the period from March 1, 2005 to March 1, 2008." *Id*. at 306.  On appeal, the defendant objected to the class definition, arguing that it "is nonsensical because it does not distinguish between the owner of a fax machine and all those people who make use of that fax machine." *Id*. at 307.  The Supreme Court of Kansas agreed with the defendant "that the definition as worded is not sufficiently precise to determine which parties are included in the class." *Id*.  It noted that, under the class definition that was certified, " there is the possibility of multiple plaintiffs stemming from one fax transmission – all individuals at a home or employed by a corporate entity, or any person who happens to 'intercept' a fax advertisement by picking it up." *Id*. at 308.  "A class including such plaintiffs differs from what [Plaintiff] explained to the court in its brief and in oral argument – that the class is limited to the owners or lessees of the fax

30

machines.  It is therefore impossible to determine from the class definition who is included in the class of 'end users' of fax numbers." *Id.* at 308.  Rather than reverse the certification as overly vague, however, because it concluded there would be advantages to adjudicating the claims on a class basis, it remanded the case and "direct[ed] the district court to modify the class definition to clarify which parties constitute the plaintiff class." *Id.* at 309.  But the court gave no direction as to what a sufficiently precise definition would be. *Id.* at 309 & 311.

Here, the proposed class definitions include all "persons who were sent" certain fax advertisements.[10]  It is entirely unclear who that includes.  This is especially so given that the expert reports and listings provided by Plaintiffs indicate that the vast majority, if not all, of the fax ads at issue in these cases were sent to municipal or corporate entities – not individuals. (D.E. No. 62-1 in *Machesney*; D.E. No. 64-1 in *APB Associates*; D.E. No. 64-1in *Compressors Engineering*).  As was the case in *Critchfield,* under those ambiguous class definitions, "there is the possibility of multiple plaintiffs stemming from one fax transmission – all individuals at a home or employed by a corporate entity, or any person who happens to 'intercept' a fax advertisement by picking it up."[11]  *Critchfield*, 293 Kan. at 308.  The proposed class definitions

---

[10]And a class including such plaintiffs differs from what Plaintiff explained to this Court. At oral argument, and in briefs submitted to the Court, Plaintiff's Counsel stated that the classes would consist of the individuals who "owned" the telephone lines that received the facsimile transmissions.

[11]To illustrate this point, consider that Plaintiff states that in relation to the *Compressor Engineering* case, unsolicited fax advertisements were sent via telephone numbers associated with entities such as: the Tuscarora Township Police Department, Little Caesars Pizza, the Leelanau County Inspections Department, Bank One, the State Police, the Kalkaska Public Transit, the Whitewater Township Fire Department, the Leelanau County Road Commission, Interlochen State Park, Alden State Bank, the Empire Village Fire Hall, the Twin Birch Restaurant, Meritt Elementary School, Interlochen Golf Club, the Helena Township Community

are imprecise and amorphous.

> **2.     If This Court Were To Modify The Class Definitions, To Include Only Those With Statutory Standing, There Would Need To Be Individualized Determinations In Order To Ascertain The Members Of The Classes**

This Court recognizes that it has the authority to modify the proposed class definitions, in order to make the classes ascertainable and ensure that they only includes persons or entities with statutory standing.

Although there is no Sixth Circuit authority addressing the standing issue, this Court concludes that, based upon the language of the statute and its legislative history, the person or entity that owned the fax machine that received the unsolicited fax advertisement at issue is the person or entity with standing to assert a TCPA claim.  Thus, Plaintiffs would have to identify the *persons or corporate entities who owned the fax machines* that received the fax advertisements at issue in order to determine who would be a member of any of the classes.

Plaintiffs state that Defendants' advertisements were sent to a specified number of unique fax numbers.  (*See Machesney* Motion at 13, stating that Defendants' advertisement was sent to 9,497 unique fax numbers; *ABP* Motion at 10, stating that "Defendants' advertisement is a form document that was sent to 4,088 unique fax numbers"; *Compressors Motion* at 10, stating that "Defendants' advertisements are form documents that were sent to 14,137 different fax numbers.").  Plaintiff's Counsel also makes references to "owners" of "fax numbers" (*see, e.g.*

─────────────────────

Center, the Petoskey Police Department, Alcoholics Anonymous, the Emmet County Sheriff's Office, the Kaleva-Norman-Dickson School, the Forest Area Middle School, the Manistee Police Department, and the Mackinaw City School District.  (D.E. No. 64-1 in Compressors Engineering case).  Under Plaintiff's proposed class definition, every employee at one of these entities who happened to pick up the single fax sent to its fax machine would appear to be a member of the proposed class in the *Compressor Engineering* case.

D.E. No. 61 at 16 in *Compressors Engineering*), but as a practical matter, one does not "own" a telephone number. Rather, one opens an account with a telephone company and is assigned a given telephone number for use while that account remains open.

In their Motions for Class Certification, Plaintiffs assert that B2B's archived records and files permit *"exact identification of potential class members*." (*See, e.g.*, D.E. No. 34 in *ABP Associates* at 6) (emphasis added). They did not, however, actually identify any persons who would be class members other than the named Plaintiffs.

At oral argument, Plaintiff's Counsel explained that B2B's records yielded a printed list of the various telephone numbers through which Defendants' advertisements were sent on specific dates, and the individuals or entities associated with those telephone numbers.

Following the hearing, this Court allowed Plaintiffs to supplement their motions by filing supplemental declarations of Robert Biggerstaff, with attached lists. (*See* D.E. No. 62-1 in *Machesney*; D.E. No. 64-1 in *APB Associates*; D.E. No. 64-1 in *Compressors Engineering*). It is clear from those submissions, that Plaintiff's Counsel has generated lists of the names of the entities who were connected to the specific telephone numbers that were used to carry the fax transmissions signals on the dates at issue. Those lists, however, are based on the listings associated with telephone numbers that existed *six to seven years ago*. As a practical matter, that is problematic because the information is likely outdated and there would be no easy way of determining the current contact information for many of those entities connected to those phone numbers years ago, and many of the corporate entities may no longer exist. (*See* D.E. No. 59 at 17-18 in *APB Associates*).

Moreover, even if there were an accurate list of the entities connected with the telephone

33

numbers through which fax signals were sent, that would not translate into a list of identifiable

class members *who owned the fax machines* that were sent the ads in question on specific dates.

As Defendants assert, the person or entity that is connected to the telephone number that

was used to transmit signals may not be the person or entity that owns the fax machine that

received the unsolicited fax advertisement.  (*See, e.g.*, D.E. at 18, noting that Plaintiff's apparent

method would not account for changes in ownership or "shared services (i.e. where two or more

companies share space and office services)."

And that is not just a hypothetical argument.  As was illustrated in *Reliable Money*

*Orders, Inc.*, it is not uncommon for one person or entity to be connected to a phone number used

to send or receive fax transmission signals while another person or entity actually owns the fax

machine that received a fax transmission via that telephone number on the date in question.  In

that case, one corporate entity (Fast & Friendly Grocery) was sent a solicitation letter from

Anderson + Wanca because a telephone number connected to it was identified as one through

which a fax advertisement was sent to a fax machine by B2B.  But that entity did not own the fax

machine at issue.  Rather, the only fax machine on the premises was owned by another corporate

entity (Reliable Money Order, Inc.) that rented space from Fast & Friendly.  *Reliable Money*

*Orders, Inc., supra*, at * 3.

Accordingly, if this Court were to modify the proposed class definitions, to include only

those with statutory standing, there would need to be individualized determination in order to

ascertain the members of the classes.

**B.     The Claims Here Are Inherently Individualized Because Of The Statutory
        Defense That Only "Unsolicited" Faxes Give Rise To A Claim**

The TCPA does not prohibit the sending of all advertisements to facsimile machines.

34

Rather, it only prohibits the sending of an "unsolicited advertisement" unless certain conditions apply, such as "the unsolicited advertisement is from a sender with an established business relationship with the recipient."  47 U.S.C. § 227(b)(1)(C)(i).

Under the TCPA, "[t]he term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing *or otherwise*." 47 U.S.C. § 227(a)(5) (emphasis added).  Thus, the recipient's prior invitation or permission could have been given orally or in writing.

There is no liability if "the unsolicited advertisement is from a sender with an established business relationship with the recipient."  The "term 'established business relationship', for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations."  47 U.S.C. § 227(a)(2).  That section states the following:

> (6) The term established business relationship for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200.

Thus, liability exists under the TCPA only if the transmissions were unsolicited, considering prior communications and business relationships.

In many TCPA cases, the defendants "oppose certification on the ground that TCPA claims are inherently individual because of the statutory requirement that only 'unsolicited' faxes

35

may give rise to a claim."  1 McLaughlin on Class Actions, § 2:20, *Limitations on applicability of class action device – Telephone Consumer Protection Act* (9th ed.).  All of the Defendants in these actions have raised this challenge.

There are no decisions from the Sixth Circuit on the issue.  Other courts that have encountered the issue have gone both ways.

Some courts, including one district court in the Eastern District of Michigan, have concluded that class certification is inappropriate in TCPA cases based upon unsolicited fax advertisements because "the claims of each class member are inherently individualized, inasmuch as an investigation would have to be conducted regarding the factual circumstances of each person who received a facsimile transmission from Defendants in order to determine liability."  *Fricko Inc. v. Novi BRS Enter., Inc.*, 2011 Wl 2079704 (E.D. Mich., Judge Zatkoff, May 25, 2011); *see also Levitt v. Fax.com*, 2007 WL 3169078 (D. Md. May 25, 2007) (The "need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable.  This determination of whether invitation or permission was given is, of necessity, highly individualized and would require a separate inquiry for each individual class member in light of their particular relationship or lack of relationship with each of the defendants."); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995).

On the other hand, some courts have certified TCPA classes after "[c]oncluding that a coordinated and widespread transmission of similar faxes . . . to numerous recipients constitutes a common course of conduct by the defendant."  1 McLaughlin on Class Actions, § 2:20,

*Limitations on applicability of class action device – Telephone Consumer Protection Act* (9th ed.). There are several such cases in the Seventh Circuit. *See, e.g. G.M. Sign, Inc.*, 2010 WL 744262 (N.D. Ill. 2010). In those cases, the courts concluded that there really would not be a need to conduct individualized inquiries regarding consent or an established business relationship because such arguments were too speculative, given that the defendants had the fax advertisements sent to large groups and Abraham has admitted she did not get prior consent before sending them.

In *Imhoff Inv., LLC*, the defendant challenged certification by asserting that "TCPA claims are inherently individual because of the statutory requirement that only 'unsolicited' faxes may give rise to a claim." *Imhoff Inv., LLC, v. SamMichaels, Inc.,* 2012 WL 4815090 at *3 (E.D. Mich. 2012). The district court did not find that to be a basis for denying class certification in that case, noting that "Defendant *does not* rely on consent as a defense." *Id.* at *4 (emphasis added).

Here, however, the Defendants *do* assert consent or the existence of an established business relationship as defenses to Plaintiffs' claims.

The Defendants in *Compressor Eng. Corp.*, state as follows with respect to their defenses of consent and/or established business relationship:

> As the court is aware, the TCPA established an exception to the rule when an established business relation (EBR) exist. An EBR can arise from instances of past sales, exchanges of business cards, phone conversations regarding goods or services, and memberships in organizations. 47 C.F.R. § 64.1200(f)(5). *CE Design, Ltd.*, 663 F.3d 443 (7th Cir. 2010). Richard Stephens testified that a significant part of his commercial mortgage business was repeat business with brokers. As such, it was highly likely that the fax campaign in question was sent to brokers with whom defendant had previously conducted business. (Exhibit A pp. 79-81). Richard Stephens was never asked at his deposition to review the list of fax numbers and businesses who allegedly received the fax campaign in

37

question.  When he did review the list, Mr. Stephens recognized many of the
numbers as companies or individuals with whom manufacturers had previously
worked.  As such, an EBR exists, at least to some of those entities that received
the fax campaign in question.  (Exhibit F).

   Since an EBR is an exception to the TCPA, an investigation would be
required with each potential plaintiff as to whether or not defendant conducted
business with them in the past.  This would degenerate into a series of individual
trials and is the exact situation that the courts have ruled should not be certified.
The potential class size in question is over 14,000 entities and investigation into
whether any past business had been conducted on a case by case basis would be
impractical.

(D.E. No. 59 at 16).

The Defendants in *ABP Assocs., Inc.*, similarly contend that this issue is one that calls for

individualized inquires, citing *Fricko, supra*, and *Levitt, supra*.   Moreover, the Defendants in

*ABP Associates* note that they requested that the fax advertisements at issue be sent to local

businesses in close proximity to the Defendants' business.  They contend that "[i]t is very

probable that some, if not many, of the businesses and individuals working there had a prior

business relationship and communications with the Defendants."  (D.E. No. 58 at 11).  The same

is presumably true for all of these Defendants (i.e., that the target list consisted of businesses and

entities in close proximity to Defendants' businesses) because they wanted to target potential

customers.

Defendants are likely to have established business relationships, as defined by the statute,

with at least a portion of those on the lists.

Plaintiffs' Counsel may respond, as they have in other cases, that the class definitions

could simply be revised to include persons who received "unsolicited" faxes (*see, e.g.*, D.E. No.

58, wherein Plaintiffs assert that by certifying a class of individuals who receive unsolicited

faxes, the court would be merely setting the boundaries of the class, not resolving substantive

issues.) But so changing the class definition would not resolve this issue or change the fact that individualized challenges could still be made.  Defendants cannot be foreclosed from pursuing this statutory defense as to those they believe they had an established business relationship with. As the Supreme Court has noted, a "class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2451, 2561 (2011) (citations omitted).

Accordingly, this Court agrees with Judge Zatkoff's view that this is an individualized issue that precludes certification.

### CONCLUSION & ORDER

For all[12] of the reasons set forth above, Plaintiff's Motion for Class Certification in this action is DENIED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 22, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 22, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

---

[12]Given the Court's conclusions on the issues addressed in this Opinion, the Court need not address Defendants' remaining arguments in opposing certification.