UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Shari Machesney,

     Plaintiff,

v.                                                                    Case No. 10-10085

Lar-Bev of Howell, Inc., *et al.*,                                    Sean F. Cox
                                                                      United States District Court Judge
     Defendants.

_____/

## OPINION & ORDER
## DENYING WITHOUT PREJUDICE
## MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

This is one of three TCPA cases that this Court has certified as a class action. This

particular case is currently before the Court on an "Agreed Motion for Preliminary Approval Of

Class Action Settlement And Notice To The Class" (D.E. No. 139), filed by Plaintiff's Class

Counsel. The motion states that Plaintiff's Counsel and Defense Counsel have agreed to settle

the case, and this motion asks the Court to grant the motion and issue a proposed "Preliminary

Approval Order." The motion is unopposed. It is this Court's role, however, to carefully

scrutinize the proposed settlement to determine if it is fair, reasonable, and adequate. This Court

shall DENY THE MOTION WITHOUT PREJUDICE because, as explained below, there are

several aspects of the proposed settlement that give this Court concern that the settlement is not

in the best interests of the class.

## BACKGROUND

This case is one of the trio of very similar TCPA cases that were assigned to this Court

around the same time. This case is another "in a string of 'junk fax' cases" under the TCPA

"that involves a fax-broadcasting company named Business to Business Solutions (B2B)."

*Bridging Communities Inc. v. Top Flite Financial Inc.*, 843 F.3d 1119, 1121 (6th Cir. 2016).

In *Bridging Communities, Inc.*, the Sixth Circuit explained the kinds of damages that are available under the TCPA:

> "The TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless the sender and recipient have "an established business relationship," the recipient voluntarily made its fax number available, and the unsolicited fax contains a notice meeting certain statutory and regulatory requirements. 47 U.S.C. § 227(b)(1)(C), (b)(2)(D); 47 C.F.R. § 64.1200(a)(4). The statute provides a private right of action permitting plaintiffs to enjoin a violation of the TCPA and/or to recover either actual money lost from the violation or $500 per violation, whichever is greater. *See* 47 U.S.C. § 227(b)(3). Damages may be trebled if a court finds that a violation was willful or knowing. *See id.*

*Id.* at 1121-22. This is one of many "junk fax" cases under the TCPA that involves Caroline Abraham and her fax-broadcasting company, B2B. As to the backdrop of these cases, the Sixth Circuit has explained:

> We have explained in prior cases that Caroline Abraham operated B2B as a fax advertising company that catered to small businesses. *See, e.g.*, *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 629-30 (6th Cir. 2015). As one district court put it, for TCPA purposes, "Abraham functioned as a modern-day 'typhoid mary[.]' " *Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 437 (E.D. Mich. 2015) (quoting *APB Associates, Inc. v. Bronco's Saloon, Inc.*, 297 F.R.D. 302, 305 (E.D. Mich. 2013)). B2B purchased a list of fax numbers from a company called InfoUSA, Inc. *See Id.* For a fee, B2B faxed clients' advertisements to hundreds of numbers from that list, a practice known as "fax-blasting." *Id.* B2B's records show that it successfully sent thousands of faxes on behalf of its clients. *See Imhoff Inv., L.L.C.,* 702 F.3d at 629. "Abraham [has] testified that she believed it was legal to send fax advertising to companies that had an established business relationship with the sender and mistakenly thought the companies on the InfoUSA list met that standard. Abraham did not call the businesses on her fax lists to seek consent to send them fax advertisements." *Id.*

*Id.* at 1122.

This Court initially denied class certification in this case because, among other things, this Court concluded that there was not an ascertainable class because only persons or entities who owned the fax machines had statutory standing to bring a claim. (*See* D.E. No. 64). In discussing statutory standing, this Court addressed an uncertainty that some other courts had addressed in terms of who can bring a TCPA claim after an unsolicited fax is sent. That is, this Court believed it was unclear what is meant by a person "who was sent" a fax advertisement (i.e., does that include the person who owns the fax machine, the person who opened the account or paid the bill for the telephone line the fax machine used to receive signals, a person to whom the fax advertisement was addressed, persons who happened to pick up the fax, or all of the above?). After examining the legislative history, this Court concluded that only the owners of the fax machine had statutory standing to assert a claim under the TCPA. At the time of the Court's decision, there was a lack of Sixth Circuit authority on the TCPA.

In an Opinion & Order issued on April 7, 2016, in light of several TCPA decisions that had been issued by the Sixth Circuit following this Court's denial of class certification, this Court ultimately certified this action as a class action. This Court certified the following class:

> All persons or entities who were sent one or more faxes on November 28, 2005, November 30, 2005, February 14, 2006, or February 15, 2006, offering "KFC Catering Prices," including "200 HOT WINGS" for $79.99 and a variety of "KFC's FAMOUS SIDE DISHES," and identifying and [sic] a "Complaint Hotline" number of (718) 645-2021 Ext. 232 or (718) 360-1330 ext. 232.

(D.E. No. 101 at Pg ID 1900). This Court further ordered as follows:

> **IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 23(g), Jason J. Thompson of Sommers Schwartz, P.C. and Phillip Bock of Bock & Hatch, LLC are **APPOINTED AS CLASS COUNSEL.**
> **IT IS FURTHER ORDERED** that, within sixty (60) days of the date of this Opinion & Order, Class Counsel shall file a proposed class notification form which complies with Fed. R. Civ. P. 23(c), together with a statement describing

the method by which the notice will be provided to class members and a list of persons or entities to whom the notice will be sent.

**IT IS SO ORDERED.**

(*Id.* at Pg ID 1900-01).

Within the body of the Opinion & Order, this Court declined to appoint

Brian Wanca or his firm as class counsel in this action. (*Id.* at Pg ID 1891 n.5). The Court

appointed Jason Thompson of Sommers Schwartz and Phillip Bock of Bock & Hatch as class

counsel, but ***expressly advised class counsel that they should be aware that any claim for***

***attorney's fees would be closely scrutinized***. (*Id.* at n.6) (emphasis added).

The Court further noted its concern that the named plaintiffs in these three actions had

agreed not to contest a one-third contingency attorney fee, but noted that other persons in the

classes would be able to oppose requested attorney fees they deem excessive, and that the Court

would also have a role in terms of approving any requested attorney fees. (*Id.* at Pg ID 1891).

On June 29, 2016, this Court granted a motion for order approving class notice and

setting a date for opt outs. (D.E. No. 106). That notice advised the recipient: "You are receiving

this Notice because *you are a member of the Class* (defined above)." (D.E. No. 104-1 at Pg ID

1918) (emphasis added). The Class Certification Notice was sent to each of the fax numbers that

Plaintiff identified through discovery as having been sent a fax by Defendants. In addition, for

those faxes that were not successfully received by Class members after three (3) attempts, the

notice was sent to them by U.S. Mail. Class members had until August 15, 2016, to opt out.

The docket reflects that approximately 20 class members, consisting of both individuals

and entities, opted out. (*See* D.E. Nos. 107-130).

On March 6, 2017, Plaintiff filed an "Agreed Motion for Preliminary Approval of Class

Action Settlement and Notice to the Class."  (D.E. No. 139).

The motion asserts that "[b]ased upon discovery and computer analysis of fax transmission records, Plaintiff determined that 15,365 of Defendant's form advertisements were successfully sent to 9,479 persons in Michigan who did not opt out of the certified class."  (D.E. No. 139 at Pg ID 2137).

Under the proposed settlement, Defendants, by and through their insurer Argonaut, has agreed to make available a total of $7,682,500.00 for the Settlement Fund.

From the Settlement Fund, Plaintiffs' Counsel would receive an attorney fee award equal to one-third of the entire settlement fund – more than 2.5 million dollars – plus unspecified "out-of-pocket expenses."  Administrative costs would also be paid from the Settlement Fund. Named Plaintiff Shari Machesney would get $15,000. The remaining money would be used to pay claims to the class members.

Each class member would get a cash payment of the lesser of $500 per fax sent to them or a "pro rata share" of the Settlement Fund after all the other payments have been made.

In addition, under the parties' agreement, "[a]ny money left in the Settlement Fund after payments to claiming class members, to the Class Representative, and to the Class Counsel would revert to and be kept by Argonaut."  (D.E. No. 139 at Pg ID 2139).

The parties' settlement agreement, which is attached to the motion, contains the following "clear sailing"[1] provision:

---

[1]A "clear sailing provision" is a provision in a settlement agreement under which the party who will be paying the fee agrees not to contest the amount of attorney fees that will be requested by plaintiff's counsel.  *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 425 (6th Cir. 2012).

10.    Incentive Award, Attorneys' Fees, and Expenses. Plaintiff shall be paid an Incentive Award from the Settlement Amount of Fifteen Thousand Dollars ($15,000.00) for representing the Settlement Class, subject to the Court's approval. In addition, ***Class Counsel shall be paid*** Two Million Five Hundred Sixty Thousand Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ***($2,560,833.33) (one third of the Settlement Amount) as attorneys' fees from the Settlement Amount plus their reasonable out-of-pocket Attorneys' Expenses***, subject to the Court's approval. ***Defendants will not object to a request for these amounts, nor will Defendants appeal any award of these amounts.*** The awarded amounts will be set forth in the Final Judgment and shall be paid from the Settlement Fund in accordance with paragraph 12 below.

(D.E. No. 139-1 at Pg ID 2168-69) (Emphasis added).

## ANALYSIS

Rule 23(e) provides that the claims of a certified class "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).[2]

"A district court must find a settlement to be 'fair, reasonable, and adequate' for it to be approved." *Pelzer v. Vassalle*, 655 F. App'x 352, 359 (6th Cir. 2016) (citing *UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). A district court ultimately "considers seven factors in making this finding: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and their representatives; (6) the reaction of absent class members; and (7) the public interest." *Id.*

As Plaintiff's Counsel note in their pending motion, a district court's review is usually a two-step process, with the first step to hold a preliminary fairness hearing, prior to notifying the

---

[2]Rule 23(e) further provides that certain procedures apply to a proposed settlement, including: 1) the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal," and 2) "[i]f the proposal would bind class members, the court may approve it only after a hearing and on a finding that it is fair, reasonable, and adequate." *Id.*

class members about the proposed settlement. (D.E. No. 139 at Pg ID 2141). The purpose of the preliminary hearing is for the Court to determine whether the proposed settlement is "within the range of possible approval." (*Id.* at Pg ID 2142). If the district court finds that the proposed class action settlement is within the range of possible approval, the Court should grant "preliminary approval" and authorize the parties to notify the class members about the settlement. (*Id.*).

For the reasons set forth below, this Court finds that the proposed settlement suffers from several apparent defects, and is not within the range of possible approval at this time.

## I.      Complexity, Expense And Duration Of Litigation, Amount Of Discovery Engaged In By The Parties, And Likelihood Of Success On The Merits

Because the Court is just at the first stage of the two-step process, it need not consider all of the above seven factors at this time. But some of the factors include: the complexity, expense and likely duration of the litigation; the amount of discovery engaged in by the parties; and the likelihood of success on the merits.

This case is very unusual in that it is one of many *incredibly similar* cases, litigated by the same Plaintiff's Counsel, that involves the very same claims and defenses, and even the same factual issues. This is one of many "junk fax" cases under the TCPA that involves Caroline Abraham and her fax-broadcasting company, B2B. As in all of these "B2B Junk Fax" cases, Abraham sent a fax ad that advertised defendants' products and/or services. Abraham, B2B's sole employee, never obtained from the fax recipients permission to send the ads.

Unfortunately for the businesses that Abraham offered her services to, "[t]he TCPA is essentially a strict liability statute" which imposes liability upon senders of unsolicited faxes. *Alea v. London Ltd. v. American Home Sys., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011). In

addition, the recipient does not have to have printed, or even looked at, the fax in order for liability to attach.

A number of years ago, Plaintiff's Counsel came across Abraham and B2B while investigating four putative class actions in Illinois. Plaintiff's Counsel ultimately got access to all of B2B's records – which the Seventh Circuit described as a "treasure trove" of potential TCPA clients. *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 492 (7th Cir. 2013). Since that time, "armed with data from B2B's electronic files," Plaintiff's Counsel "filed **scores** of putative class actions" under the TCPA against the various defendants that had hired Abraham and/or B2B. *Id.* (Emphasis added).

Plaintiff's Counsel state that they have litigated 71 of these B2B Junk Fax Cases in federal court. (*See* D.E. No. 142 at Pg ID 2201). The cases are all virtually identical, with only the names of the defendants, and the specific details concerning the fax ads that were sent (how many, to whom, substance of ad, and dates sent) that differ. Plaintiff's Counsel are able to recycle the same pleadings, research, and motions in all of these cases. That is illustrated by the trio of cases before this Court, where Plaintiff's Counsel filed virtually the same complaint and motions in all three cases – throughout the litigation. They have also been able to use the same expert, Robert Biggerstaff, in all of these cases. Little case-specific discovery is needed. They typically just depose a representative of the Defendant(s), the named plaintiff, and sometimes (but not always) Abraham.

In this case, the discovery consisted of just three depositions (Machesney, Biggerstaff, and a representative of Defendant). The parties also exchanged one set of interrogatories.

Plaintiff's Counsel have been very successful in these cases. These cases typically settle

or have liability established at the summary judgment phase. In prior briefs, Plaintiff's Counsel have stated that "defendants are subject to a strict liability standard and near certain liability for their wrongful acts under the TCPA." (D.E. No. 85 at Pg ID 1596).

Granted, there have been time delays in this action, while several discrete legal issues worked their way through the courts, and those issues have required a fair amount of motion practice. (*See* D.E. No. 101 at Pg Id 1869-70, 1875 & 78).[3] But the bottom line is this is not a complex case, there has not been much discovery or original work product needed, yet Plaintiff's likelihood of success as to the claims in this action is high.

Against that unusual backdrop, this Court must consider the risk of fraud or collusion as to the proposed settlement before it.

## II.    Risk Of Fraud Or Collusion

"Because there is typically no client with the motivation, knowledge, and resources to protect its own interests, the judge must adopt the role of a skeptical client and critically examine the class certification element, the proposed settlement terms, and procedures for implementation." MANUAL FOR COMPLEX LITIGATION, (Fourth) § 21.61, *Judicial Role in Reviewing a Proposed Class Action Settlement*, at 374-75; *see also* Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES, 17 to 23 (3d ed. 2010).

"[T]he Federal Judicial Center, in the guidance it provides judges handling class suits, the Manual for Complex Litigation, sets forth a list of 'recurring potential abuses in class action

---

[3]As explained in prior opinions, this Court followed Sixth Circuit authority relating to subject matter jurisdiction of TCPA cases when it dismissed the trio of cases early on in the cases, and later followed Sixth Circuit authority on the mootness-by-unaccepted-offer-of-judgment theory. But the Supreme Court ultimately ruled otherwise on both issues.

litigation that judges should be wary of as they review proposed settlements. The Federal Judicial Center's shorter Pocket Guide similarly enumerates a series of problems that 'show their potential unfairness on their face,' dubbing these 'hot button indicators.'" NEWBERG ON CLASS ACTIONS, § 13:56, *Red flags in proposed settlements – Generally* (5th ed.).

"Generally speaking, all of the red flags have at their heart the concern that the class's attorneys have sold out the class, settling the class members' claims for too little in return for a guaranteed attorney's fee." *Id.* This Court is concerned that this may have occurred here.

A.     **As An Initial Matter, A Claims Process May Not Be Necessary In This Case At All.**

As an initial matter, one could argue that requiring the class members to submit a claim form at all is unnecessary in this particular case, and that requiring them to do so is simply an obstacle aimed at reducing the amount actually paid out to claimants.

It is well known that in a typical consumer class action, the rate at which class members take the time to actually submit a claims form is low. *Gascho v. Global Fitness Holdings,* 822 F.3d 269, 290 (6th Cir. 2016).

As to a proposed claims process for a proposed class action , the Pocket Guide advises a reviewing district court to "[f]irst, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out." *Id*. at 30. That appears to be the situation in this particular case.

Indeed, the Class Certification Notice, used to let class members know about the class action, was sent to each of the fax numbers that Plaintiff identified through discovery as having been sent a fax by Defendants. Notably, it stated: "You are receiving this Notice because *you*

*are a member of the Class* (defined above)." (D.E. No. 104-1 at Pg ID 1918) (emphasis added).[4]

Throughout this case, it has been Plaintiff's Counsel's position that the class members are objectively ascertainable, based on the list of persons/entities that were sent the fax ad. The Sixth Circuit has expressed that view too. *See Imhoff Investment, LLC v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015) (noting that Biggerstaff's report established where the fax ads at issue were sent).[5] Biggerstaff is the same expert that is used in all of these cases. In this case, like the others, he has submitted a report that shows, as to each fax sent: 1) the fax telephone number it was sent to; and 2) the corresponding name and mailing address of the person/entity to whom it was successfully sent. (*See* D.E. No. 62-1). Since that report literally has the names and addresses of where the fax ads at issue in this case were sent, why is there a need to make the class members who did not opt out file a claim form at all? Why couldn't they just send checks to those ascertainable class members, and then propose a method as to what to do with the total amount of returned (as undeliverable) or uncashed checks?

Indeed, Plaintiff's Counsel states that they already plan to use the database to determine the number of faxes each claimant was sent – without the claimant's input on that issue. The parties state that there were 15,365 faxes sent to 9,479 persons/entities who did not opt out. That means some of the persons/entities were sent more than one fax ad. But the claim form does

_____

[4]But now, the proposed claim form, that would be sent via that same method would now state: "you appear to be" a member of the settlement class, and would require anyone submitting a claim to "certify ownership" of the fax number.

[5]In addition, the case law is clear that a person need not have printed or read the fax ad, or even be aware that it was sent, in order to have a claim. *Id*. That is because electronic confirmation of transmission is sufficient. *Id*.

allows a claimant to state that it was sent more than one fax ad.  Plaintiff's Counsel state they don't need that information from claimants because they already have it from the data base:

| THE COURT: | So some persons/entities were sent more than one fax ad, correct? |
|---|---|
| MR. OPPENHEIM: | Yes. |
| THE COURT: | If you look at your proposed claim form, tell me how many – how a claimant indicates that the claimant was sent more than one fax? |
| MR. OPPENHEIM: | They wouldn't have to.  We would simply use the records that the expert in the case determined from the B2B computers.  We have a list, and I believe we've submitted it with the expert report previously, which says which numbers got one and which numbers got two.  So the class members wouldn't have to remember receiving anything. |

(May 4, 2017 Hearing Tr.).

If the list comprised of fax numbers, names, and addresses is accurate, then it may be feasible, and more efficient, to mail checks without requiring a claim form.   On the other hand, if the data is no longer accurate, then the proposed method of disseminating the notice (sending to fax numbers and mailing after three unsuccessful attempts) may not be sufficient.[6]

The Court also notes that, in other B2B Junk Fax cases, Plaintiff's Counsel has used a process to *update* the addresses for the names in the data base.  (*See* Case No. 10-10010, D.E. No. 89-2 at Pg ID 2938) (class member list was "updated using the National Change of Address system (NCOA), which updates the addresses for all persons and businesses who had moved in the previous four years and who had filed a change of address with the U.S. Postal Service."). Notably, however, they make no reference to doing that in this case – even though there was a longer time delay between the date of the fax ad and the settlement in this case.

---

[6]Rule 23(e) provides that certain procedures apply to a proposed settlement, including that the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal."

B.      **The Proposed Settlement Improperly Restricts Claims, While At The Same Time, Provides For A Reversion Of All Unclaimed Portions Of The Settlement Fund To Defendants' Insurer, And Also Contains A "Clear Sailing Provision."**

"There are a number of recurring potential abuses in a class action litigation that judges should be wary of as they review proposed settlements," which include "imposing such strict eligibility conditions or cumbersome claims procedures that many members will be unlikely to claim benefits, particularly if the settlement provides that the unclaimed portions of the fund will revert to the defendants."  Manual for Complex Litigation, Fourth Ed., § 21.61, Judicial Role in Reviewing a Proposed Class Action Settlement, at 374-75.

"Restrictions on claims/reversions of unclaimed funds to defendant" is one of the enumerated "Hot button indicators" described in the guide published by the Federal Judicial Center.  That publication explains that "[s]ome settlement terms show their potential unfairness on their face; we call them 'hot button indicators.'"  Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges, 17 to 23 (3d ed. 2010).  That guide states:

4. Restrictions on claims/reversion of unclaimed funds to defendants

> Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may dramatically reduce the apparent value of a settlement. Coupled with a provision that any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed in the next paragraph), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class.  The addition of a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause *adds decibels to the alarms set off by the reversion clause.  Some courts treat the combination as creating a presumption of unfairness.*

> *A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to use the artificially inflated settlement amount as a basis for attorney fees*. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as distributing the entire settlement fund to the class members who file claims. Prorating the fund in that way avoids the possibility on unclaimed funds and is a standard practice in securities class settlements . . .
>
> To align plaintiff's counsel's interests with those of the class, to discourage the use of a reversion clause, and to negate the effect of a clear sailing agreement, *considering linking the award of attorney fees to the value of the funds distributed to the class* or the coupons redeemed by the class (see section V.B below).

*Id.* (emphasis added).

Here, the proposed class action settlement *does all of those things*: 1) it limits the amount of recovery per class claimant: 2) it restricts who can file a claim, contrary to the class that was actually certified in this case; 3) it includes a provision that all unclaimed funds revert back to Defendants' Insurer; and 4) it includes an attorney fee award equal to one-third of the entire settlement fund, despite the reversion provision and a likely low rate of claims being filed by class members in this particular case.  In addition, the parties' agreement contains a clear sailing provision, under which Defendants agree not to contest the attorney fees requested, and the named Plaintiff also agreed in her written retainer agreement not to contest the attorney fees requested.

### 1.     The Proposed Settlement Limits The Recovery Per Claimant.

The Complaint in this action requests actual or statutory damages, whichever is greater. (D.E. No. 1 at Pg ID 8).  Again, in *Bridging Communities, Inc*., the Sixth Circuit explained the kinds of damages that are available under the TCPA:

> The statute provides a private right of action permitting plaintiffs to enjoin a violation of the TCPA and/or to recover either actual money lost from the

14

violation or $500 per violation, whichever is greater. *See* 47 U.S.C. § 227(b)(3).
Damages may be trebled if a court finds that a violation was willful or knowing.
*See id.*

*Id.* at 1121-22. Thus, each claimant is able to recover the greater of actual damages or statutory

damages in a TCPA action. As to statutory damages, those damages are either $500 or $1500

per fax.

Here, the proposed settlement would limit the recovery of every claimant (other than the

Named Plaintiff) to a maximum of $500. This settlement would also impose that limit even

though it will be distributing any unclaimed funds back to Defendants' Insurer.

The parties may wish to consider using some alternative approach, such as prorating the

available funds to the claimants, as the Federal Judicial Center's Guide suggests. A claimant

filing his or her own action would not be limited to $500 per fax. Thus, it may be appropriate for

the maximum pro rata share be increased to $1500 per fax. In addition or alternatively,

unclaimed funds (or a portion of them) could be directed to go to a designated charity, rather

than back to Defendants' insurer.[7]

### 2. Counsel Are Agreeing To Restrict Who Can File A Claim – Contrary To The Class Actually Certified In This Action And Contrary To Sixth Circuit Case Law.

Counsel for the Parties are agreeing to restrict who can file a claim – contrary to the

actual class that was certified in this case. This Court certified the following class:

> All persons or entities *who were sent* one or more faxes on November 28, 2005,
> November 30, 2005, February 14, 2006, or February 15, 2006, offering "KFC
> Catering Prices," including "200 HOT WINGS" for $79.99 and a variety of "KFC's
> FAMOUS SIDE DISHES," and identifying and [sic] a "Complaint Hotline" number of

---

[7]Plaintiff's Counsel have had settlements in other B2B Junk Fax cases where that was
done. *See, e.g.*, Case No. 10-10010 (wherein a specified portion of unclaimed settlement fund
would be divided by six designated charities).

(718) 645-2021 Ext. 232 or (718) 360-1330 ext. 232.

(D.E. No. 101 at Pg ID 1900) (emphasis added).

Notably, this Court certified that broad class requested by Plaintiff's Counsel based on Sixth Circuit authority, wherein the Sixth Circuit has taken the position that recovery under the TCPA is *not* premised on the ownership of a fax machine, or the ownership of other items used in connection with the fax sent, such as a telephone number, paper, or ink. *See American Copper & Brass, Inc. v. Lake City Indus. Products, Inc*., 757 F.3d 540, 544 (6th Cir. 2014). The Sixth Circuit has expressed the view that such ownership interests are not required in order to assert a TCPA claim because "unsolicited fax advertisements impose costs on all recipients, irrespective of ownership and cost of paper and ink, because such advertisements waste the recipients' time." *Id*. at 544.[8] Thus, the Sixth Circuit has very broadly defined those persons or entities who may assert a TCPA claim based on an unsolicited advertisement as "recipients of" the unsolicited fax advertisement. *Id.; see also Imhoff Investment, LLC v. Alfoccino, Inc*., 792 F.3d 627, 631 (6th Cir. 2015).

Yet the "Proof of Claim" form that the parties want to require the class members to submit tells them they must "verify ownership" of the telephone number to which the advertisements were faxed to in order to submit a claim:

**2.      You Must Verify Ownership of the Fax Number(s) Listed in #1 above:**

(a)      "The fax number(s) listed above was/were assigned to me or my company throughout the period from November 28, 2005 to February 15, 2006."

---

[8]Plaintiff's Counsel is well aware of this line of authority wherein the Sixth Circuit has rejected the notion that claimants be restricted to those with ownership interests. (*See, e.g.* D.E. No. 89 at Pg ID 1753-54).

_____
(Sign your name here)

**OR**

    (b)    The fax number(s) listed above was/were not assigned to me or my company throughout the period from November 28, 2005 to February 15, 2006.  Explain when you obtained the fax number(s) listed in #1 above:

_____
(Sign your name here)

(*Id.*) (bolding in original).

In light of the class that was actually certified in this case, in line with Sixth Circuit authority noted above, the proposed claim form purports to unnecessarily restrict who can file a claim.  Doing so would likely reduce the number of completed claim forms that would be submitted.   This is especially so considering the types of places these faxes were sent (e.g., schools, businesses, churches, township and local government offices, etc.).

**3.**      **The Proposed Settlement Contains A Provision That Unclaimed Funds Revert Back To Defendants' Insurer.**

The proposed settlement contains a reversion provision.  Under the parties' agreement, "[a]ny money left in the Settlement Fund after payments to claiming class members, to the Class Representative, and to the Class Counsel would revert to and be kept by Argonaut."  (D.E. No. 139 at Pg ID 2139).   Thus, if there is a low rate of claims submitted by class members – which is typical in consumer class actions –  those few class members that submit a claim would each get $500, but the remainder of the Settlement Fund would go back to the insurer of the alleged wrongdoers.  That is why reversion clauses are often viewed with skepticism. While the Sixth Circuit has not adopted any bright-line rules as to reversion clauses, they are a factor this Court

may consider.  *See Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269 (6th Cir. 2016).

The data available to this Court indicates that there will likely be a low claims rate in this action.  At the Court's instruction, Plaintiff's Counsel provided the actual claims rates in other B2B Junk Fax case settlements in this district.  (*See* D.E. No. 142 at Pg ID 2201).  The claims rate in the most recent B2B Junk Fax case settled by Plaintiff's Counsel in 2017 was 2%, and the claims rate in a 2015 settlement was 6%.

Of course, reversion of unclaimed funds to the defendant or its insurer is not the only option when a low claims rate is expected.  Class action settlements can also provide that unclaimed funds will go to designated charitable or community entities.  *See, eg. Moulton v. United States Steel Corporation*, 581 F.3d 344, 351-52 (6th Cir. 2009) (settlement provided that any portion of settlement fund that was unclaimed by the class members would go to the River Rouge and Ecorse public schools).  That may be an especially appropriate option here.
In this case, the fax ads were sent to targeted geographical areas (i.e., to persons and businesses near to Defendants' businesses that were advertised in the body of the faxes).  The record reveals that the fax ads at issue here were actually sent to a number of local established charities (e.g., Hospice of Michigan, the Food Bank of Oakland County, Catholic Charities, Michigan Animal Rescue League, Lighthouse of Oakland County, and the Salvation Army) that could certainly benefit from such a provision.  (*See* D.E. No. 62-1 at Pg ID 1071-77, 1079-80).  Providing that unclaimed funds go to such local charities, rather than revert to the insurer of the alleged wrongdoers, would certainly be in the public interest, and would also benefit the class itself.

Under the circumstances presented here, the Court is concerned that the reversion clause in this action, that provides for all unclaimed funds to go back to the insurer of the alleged

wrongdoers, may reflect fraud or collusion and is not in the best interests of the class.

> ### 4. The Parties Settlement Agreement Contains A Clear Sailing Provision, And The Named Plaintiff Agreed To A Similar Provision In Her Retainer Agreement.

The parties' settlement agreement contains a clear sailing provision, under which Defendants agree they will not object to, or appeal, an attorney fee award of one-third of the settlement proceeds.

A clear sailing agreement, standing alone, is not necessarily a problem. *See Gascho v. Global Fitness Holdings, LLC*, 822 F.3d at 291. But such provisions do give a district court a heightened duty to peer into the provision and scrutinize closely the relationship between the attorney's fees that counsel are agreeing to and the benefit to the class. *Id.*

That this settlement has a clear sailing provision, especially combined with the restriction on claims and reversion of all unclaimed funds, gives this Court concern that the class's attorneys may have sold out the class, in return for a guaranteed attorney's fee.

## III. This Court Is Not Inclined To Award The Named Plaintiff An "Incentive Fee" Of $15,000.

Under the proposed settlement, the most that any class member could possibly receive is $500, yet the Named Plaintiff Shari Machesney would receive an award of $15,000. The parties' written Settlement Agreement states that payment to Machesney is an "Incentive Award" (D.E. No. 139-1 at Pg ID 2168) and so does the proposed notice of settlement. (D.E. No. 139-1 at Pg ID 2186).

As Judge Raymond Kethledge explained in *In re Dry Max Pampers Litigation*, the Sixth Circuit "has never approved the practice of incentive payments to class representatives, though in fairness [it has] not disapproved the practice either." *In re Dry Max Pampers Litigation*, 724

F.3d 713, 722 (6th Cir. 2013). "Thus, to the extent that incentive awards are common, they are like dandelions on an unmown lawn – present more by inattention than by design. And we have expressed a "sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003). In that case, the Sixth Circuit did not lay down a categorical ban on incentive payments, but stated:

> But we do have occasion to make some observations relevant to our decision here. The propriety of incentive payments is arguably at its height when the award represents a fraction of a class representative's likely damages; for in that case the class representative is left to recover the remainder of his damages by means of the same mechanisms that unnamed class members must recover theirs. The members' incentives are thus aligned. **But we should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole;** for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief. *Accord Radcliffe v. Experian Info. Solutions,* 715 F.3d 1157, 1161 (9th Cir. 2013) holding that the "incentive awards significantly exceeded in amount what absent class members could expect upon settlement approval" and thus "created a patent divergence of interests between the named representatives and the class").

> This case falls into the latter scenario. The $1000–per–child payments provided a *disincentive* for the class members to care about the adequacy of relief afforded unnamed class members, and instead encouraged the class representatives "to compromise the interest of the class for personal gain." *Hadix,* 322 F.3d at 897. The result is the settlement agreement in this case. The named plaintiffs are inadequate representatives under Rule 23(a)(4), and the district court abused its discretion in finding the contrary.

*Id.* at 722-23 (italics in original, bolding added for emphasis); *see also Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 310-11(6th Cir. 2016) (expressing concern with district court's approval of "incentive awards" to named plaintiffs).

This Court concludes that this case falls into that latter scenario. The requested $15,000 "incentive payment" to Machesney is *30 times* more than the maximum that any class member

could receive under the proposed settlement. It would also make Machesney far more than "whole," as she asserts that she was sent just one fax ad (*see* D.E. No. 1 at Pg ID 3), the statutory maximum for her individual claim would be $1,500, and this Court cannot imagine any factual scenario under which Machesney would have incurred "actual damages" approaching $15,000 for having been sent one unsolicited fax ad.

Moreover, Machesney agreed in her retainer agreement not to contest the requested attorney fees. (*See* Ex A to D.E. No. 64, filed under seal). As this Court explained in a prior opinion:

> . . . [T]hese proposed named Plaintiffs, who claim that they will fairly and adequately protect the interests of the class, have agreed, in advance, not to contest a one-third contingency fee request by counsel – regardless of the amount of work actually performed by Counsel in these cases. That is troubling to this Court, in light of the repetitive nature of these actions and considering the amount of work actually performed by Counsel in relation to the settlements and/or judgments that have been obtained in other cases.

(D.E. No. 64 at Pg ID 1277).

Recall that one of the factors this Court is to consider in ultimately deciding if the proposed settlement is fair is the opinion of the named class representative as to the settlement. *Pelzer v. Vassalle*, 655 F. App'x 352, 359 (6th Cir. 2016) (citing *UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

Here, it appears that the sole named plaintiff in this case (Machesney) has essentially been "bought off" – she is getting an award that is thirty times more than the maximum award that any class member could ever get under the settlement, in exchange for her not objecting to the large attorney fee award requested by Plaintiff's Counsel. Her opinion as to whether the settlement is "fair" will be rather meaningless.

As such, this Court is *not* inclined to award Machesney an award of $15,000. Indeed, that request makes the Court question whether Machesney is an adequate class representative and should continue on as the named plaintiff in this class action.

**IV.     The Court Is Not Inclined To Approve Plaintiff's Counsel Requested Attorney Fee Award Of One-Third Of The Settlement Fund, And Initially Concludes That The Lodestar Method Would Be More Appropriate Given The Circumstances Of This Case.**

Finally, the Court notes that it is *not* inclined to approve Plaintiff's requested attorney fee award of one-third of the settlement fund, given the unique aspects of this case.

There are two main ways to calculate fees for Plaintiff's counsel in a class action: 1) the lodestar method, based on hours worked; or 2) a percentage of the fund award.

"To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a 'reasonable hourly rate.'" *Gascho*, 822 F.3d at 279. The district court may then, "within limits" adjust the lodestar to reflect relevant considerations peculiar to the subject litigation. *Id.*

"In contrast, to employ the percentage of the fund method, the court determines a percentage of the settlement to award class counsel." *Id.* "A percentage of the fund cross-check is optional, and [the Sixth Circuit has] repeatedly upheld a district court's determination that a fee award is reasonable based solely on a lodestar analysis." *Gascho*, 822 F.3d at 281.

In light of all the circumstances presented here, this Court is not inclined to award the percentage-of-the-fund attorney fees requested here – more than 2.5 million dollars. The Court initially concludes, based on the information available to it, that the lodestar method would be more appropriate under the circumstances of this particular case.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that the Motion for Preliminary

Approval Of Class Action Settlement And Notice To The Class (D.E. No. 139) is DENIED

WITHOUT PREJUDICE.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 6, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 6, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager